******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

PETER ALAN RINFRET *v.* MELISSA
JAYNE PORTER
(AC 38753)

Sheldon, Prescott and Pellegrino, Js.

*Argued February 7—officially released May 30, 2017*

(Appeal from Superior Court, judicial district of
Stamford-Norwalk, Emons, J.)

*Carlo Forzani*, with whom, on the brief, was *Eric
H. Rothauser*, for the appellant (plaintiff).

*Thomas M. Cassone*, for the appellee (defendant).

*Opinion*

PRESCOTT, J. The dispositive issue in this appeal is whether the trial court improperly awarded the defendant, Melissa Jayne Porter, her attorney's fees under the bad faith exception to the "American rule"[1] by broadly concluding that the underlying custody action brought by the plaintiff, Peter Alan Rinfret, was both (1) "entirely without color" and (2) taken in bad faith. We conclude that the court did not find with adequate specificity that the plaintiff's actions were entirely without color. Accordingly, we reverse the judgment awarding the defendant $87,548.11 in attorney's fees and remand the matter for further proceedings in accordance with this opinion.[2]

Before we discuss the facts, as found by the court in its oral decision, and the procedural history of this case, we highlight the manner in which the trial court made its factual findings and our concern that the procedures utilized by the court have made more difficult our appellate review of the plaintiff's claims. On January 20, 2015, the defendant filed her motion for attorney's fees and costs on the ground that the plaintiff's application for custody was brought without color and in bad faith.[3] During a July 23, 2015 hearing on the motion, the court ordered each party to file proposed findings of fact "because it's becoming clear to the court that it needs to make findings of fact in order to get to the end two questions [set forth in *Maris* v. *McGrath*, 269 Conn. 834, 845, 850 A.2d 133 (2004)] as to whether or not this case or any part of this case was either frivolous *or* in bad faith."[4] (Emphasis added.) Each party filed proposed findings of fact on September 10, 2015,[5] and the plaintiff subsequently filed an objection to the defendant's proposed findings of fact relative to her motion for attorney's fees on December 7, 2015.

On December 8, 2015, the court held another hearing on the motion, at which time it informed the parties of the following: "I—if not in total part, I find the defendant's facts to be credible. And I find the plaintiff's proposed findings and opposition to defendant's facts to be more like testimony that the court found at different intervals was not at all credible.

"So I thought to myself, I am—I have already spent four years on this case and I have absolutely no intention of studying this case anymore and writing out what I consider to be findings of fact separate such that the decision will reiterate what's already in the file, what's already on all the transcripts, and what's already in the proposed findings of fact. I'm not going to do that. What I thought that the sanest way to be was to take the defendant's proposed findings of fact and I want to address every single one on the record today. I think it's a clean way to do things, and I want to attack—I want to attack every single one of those facts as facts,

not proffers on the part of the plaintiff, not what you think the evidence is—is credible; but, to the extent that we can adhere to what's on the transcript, what's in the files, I want to find and articulate those facts as we find them."

The court then proceeded to go through the first twenty-eight paragraphs of the defendant's proposed findings of fact, intermittently pausing to ask both parties, albeit with a focus on the plaintiff's counsel, to confirm or deny the proposed finding in question.[6] No matter how the plaintiff's counsel responded, that is, whether he agreed with the proposed finding, disagreed with the proposed finding, or expressed that he would "leave [the proposed finding] to the defendant's proof,"[7] the court immediately found each of the first twenty-eight paragraphs as fact.[8] We note that the factual support for many of these findings is scattered over various days of the record in a proceeding that continued for four years, thereby making our review more difficult. Those facts were as follows.

The plaintiff, a citizen of the United States (U.S.), and the defendant, a citizen of the United Kingdom (U.K.), met in October, 2009, and began cohabitating in Greenwich, Connecticut, in February, 2010. The parties had a child on October 11, 2010. In April, 2011, the parties discussed relocating to London, England, and ultimately decided to do so on July 7, 2011, at which time they made substantial preparations for the move.

On or about September 7, 2011, while in the U.K. together, the plaintiff surreptitiously took the minor child's American passport from the defendant with the intent to abscond with the minor child without the defendant's consent and bring him back to the U.S. Although the plaintiff eventually conceded that he had taken the passport, he refused to return it to the defendant. Accordingly, the fearful defendant filed an application in a court in Stockport, England, under the Children Act 1989 for residence, contact, prohibited steps, and financial provision orders concerning the minor child (Stockport proceeding). That court entered an immediate temporary order that the minor child not be removed from the jurisdiction of England and Wales. Subsequently, on October 18, 2011, the plaintiff brought a Hague Convention proceeding against the defendant in the U.K. under the Child Abduction and Custody Act 1985 (Hague proceeding),[9] thereby staying further actions in the Stockport proceeding.

Shortly thereafter, the plaintiff filed the present case in the Superior Court by way of an application for custody dated November 12, 2011, and an order of notice dated December 7, 2011. On the last two pages of the affidavit that the plaintiff filed with his application, he affirmatively responded to the following statements: "I have not been a party or a witness or participated in any other capacity in cases in Connecticut or any other

state concerning custody of or visitation with any child listed in this affidavit," and "I do not know of other civil or criminal proceedings in Connecticut or any other state, now or in the past, that could affect the current proceeding . . . ." In addition, directly below the defendant's signature, there was a legend that stated: "You have an ongoing duty to tell the court about any case that could affect the current proceeding, in Connecticut or any other state, if you learn about it during this case." The defendant was fully aware of the Stockport and Hague proceedings at the time he filed the custody application in Connecticut.[10]

On December 5, 2011, a hearing was held before the High Court in London in which several orders were entered, largely on the consent of the plaintiff's U.K. counsel, including the following: the Hague proceeding would be dismissed; the Stockport proceeding would be transferred to England's family court; the shared residence, contact, and maintenance issues between the parties would be mediated; England and Wales would be the forum conveniens for all disputes concerning the minor child; and the minor child would reside with the defendant on an interim basis, although the plaintiff would have reasonable contact time with him.

Over the next several months, the defendant tried to have the custody matter adjudicated in the courts of the U.K., while attempting to have the present Connecticut action dismissed. The plaintiff appeared in person at hearings in both the U.K. and Connecticut sporadically throughout this time period. Notably, on August 15, 2012, a U.K. judge ordered the plaintiff to make monthly payments to the defendant, on an interim basis, for the minor child's support.[11] Eventually, in December, 2012, the U.K. court made an express finding that it had jurisdiction to hear the defendant's application for support, on the ground that the U.K. was the habitual residence of the minor child. It also decided to continue the previous August 15, 2012 support order.

Meanwhile, in the present Connecticut action, the defendant filed a motion to dismiss the case on February 14, 2012, citing the following grounds: the plaintiff had voluntarily consented to the jurisdiction of the courts of England for all disputes concerning the minor child, and there had been no custody determination by Connecticut; there was a foreign custody determination in effect within the meaning of General Statutes § 46b-115hh et seq.; the court should decline to exercise jurisdiction over the action pursuant to General Statutes § 46b-115q, as it is a forum non conveniens for resolution of this matter; and the court should decline to exercise jurisdiction over the action pursuant to the common law, as it is a forum non conveniens for resolution of this matter. An evidentiary hearing on the motion to dismiss eventually took place over the course of several days in 2014, at which both parties testified

as witnesses.

Although the plaintiff personally attended the hearing on the motion to dismiss on some of these dates in the beginning and middle of the year, he deliberately refused to appear personally in court on both October 31, 2014, and December 1, 2014, even though he had been ordered to do so.[12] On a rescheduled hearing date of December 17, 2014, the plaintiff again failed to appear in person, but ultimately appeared via telephone, at which time he elected to withdraw the present action with prejudice with a stated intention to pursue custody of the minor child in the U.K. courts.[13]

After the court made these findings of fact, the parties then were given a chance to argue orally regarding the motion before the court. At the end of the hearing, the court issued its ruling on the record, stating: "[T]he court finds that the entire *case* was brought by [the plaintiff] wherein his claims were entirely without color and that he continuously, for over a four year period, including today, acted in bad faith. The record and the facts are replete with examples of that . . . bad faith. And, for that reason, the court is going to grant the request for attorney's fees in the amount of $87,548.11." (Emphasis added.) The plaintiff then brought the present appeal.

On appeal, the plaintiff claims, inter alia, that the court improperly awarded attorney's fees to the defendant under the bad faith exception to the American rule by broadly concluding, in derogation of *Maris* v. *McGrath*, supra, 269 Conn. 834, that the plaintiff's underlying custody action was both (1) "entirely without color" and (2) taken in bad faith. We conclude that the court did not find with adequate specificity that the plaintiff's actions were entirely without color.

We begin by setting forth the standard of review and legal principles relevant to this claim. "It is well established that we review the trial court's decision to award attorney's fees for abuse of discretion. . . . This standard applies to the amount of fees awarded . . . and also to the trial court's determination of the factual predicate justifying the award. . . . Under the abuse of discretion standard of review, [w]e will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion. . . . [Thus, our] review of such rulings is limited to the questions of whether the trial court correctly applied the law and reasonably could have reached the conclusion that it did." (Internal quotation marks omitted.) *Gianetti* v. *Norwalk Hospital*, 304 Conn. 754, 815, 43 A.3d 567 (2012).

"As a substantive matter, [t]his state follows the general rule that, except as provided by statute or in certain defined exceptional circumstances, the prevailing litigant is ordinarily not entitled to collect a reasonable

attorneys' fee from the loser. . . . That rule does not apply, however, where the opposing party has acted in bad faith. . . . It is generally accepted that the court has the inherent authority to assess attorney's fees when the losing party has acted in bad faith, vexatiously, wantonly or for oppressive reasons." (Citations omitted; internal quotation marks omitted.) *Maris* v. *McGrath*, supra, 269 Conn. 844.

"[A] litigant seeking an award of attorney's fees for the bad faith conduct of the opposing party faces a high hurdle." *Berzins* v. *Berzins*, 306 Conn. 651, 662, 51 A.3d 941 (2012). "To ensure . . . that fear of an award of attorneys' fees against them will not deter persons with colorable claims from pursuing those claims, we have declined to uphold awards under the bad-faith exception absent both clear evidence that the challenged actions are entirely without color and [are taken] for reasons of harassment or delay or for other improper purposes . . . ." (Internal quotation marks omitted.) *Maris* v. *McGrath*, supra, 269 Conn. 845. Thus, "*Maris* makes clear that in order to impose sanctions pursuant to its inherent authority, the trial court must find *both* [1] that the litigant's claims were entirely without color *and* [2] that the litigant acted in bad faith." (Emphasis in original; footnote omitted.) *Berzins* v. *Berzins*, supra, 663.

Significantly, our appellate courts have "declined to uphold awards under the bad-faith exception[14] absent . . . a high degree of specificity in the factual findings of [the] lower courts." (Footnote added; internal quotation marks omitted.) *Maris* v. *McGrath*, supra, 269 Conn. 845. For instance, in *Kupersmith* v. *Kupersmith*, 146 Conn. App. 79, 78 A.3d 860 (2013), this court concluded that the trial court "found generally both that the defendant's motion [to vacate] was entirely without color and that he acted in bad faith, yet the court did not support that finding with factual specificity. . . . The sole factual finding on which the court determined that the defendant's motion to vacate was made in bad faith was its conclusion that the motion was lacking in a reasonable basis in fact and law . . . . [W]e do not agree with the court that the defendant's motion to vacate was entirely without color. Because the court made no [specific] findings of fact to support its conclusion that the defendant filed his motion in bad faith, we conclude that the court [improperly awarded] attorney's fees . . . ." (Citations omitted; internal quotation marks omitted.) Id., 98–99. Moreover, our Supreme Court's holding in *Berzins* makes clear that the two required findings must be *separate* from each other. *Berzins* v. *Berzins*, supra, 306 Conn. 663 ("although the court found that the [defendant's] actions were entirely without color and supported that finding with a high degree of specificity in its factual findings, the court did not make a separate finding that the [defendant] acted in bad faith" [footnote omitted]).

We conclude, for the following reasons, that the court failed to comply with the requirements in our case law that it must find clear evidence that the challenged actions are entirely without color *and* are taken in bad faith, and must separately set forth those factual findings with a high degree of specificity. *Berzins* v. *Berzins*, supra, 306 Conn. 663.

First, in the present case, during the December 8, 2015 hearing on the motion for attorney's fees, the court made twenty-eight factual findings that it adopted directly from the defendant's proposed findings of fact,[15] but it did not state which of those facts supported its finding of "entirely without color" and which supported its finding of "bad faith conduct." This ambiguity extended throughout the entirety of the court's brief oral decision. For example, as previously recounted, the court stated at the end of the hearing that it "finds that the entire case was brought by [the plaintiff] wherein his claims were entirely without color and that he continuously, for over a four year period, *including today*, acted in bad faith." (Emphasis added.) Without more elaboration on the part of the court, we have no way of ascertaining what conduct the court was referencing when it stated "including today," because it is not clear what the court believed the plaintiff had done that day that was improper, other than contesting the motion, and whether that perceived impropriety supported the court's finding that his claims were entirely without color or its finding that he acted in bad faith. Ultimately, we conclude that although the court found *generally* both that the plaintiff's custody action was entirely without color and that he acted in bad faith, it did not delineate the two separate findings, and it did not cite factual support for each with the high degree of specificity required by our case law. See *Berzins* v. *Berzins*, supra, 306 Conn. 663.

Second, the findings made by the trial court, although arguably supportive of a conclusion that the plaintiff's actions constituted bad faith, do not necessarily support a conclusion that this action was brought or maintained entirely without color.[16] Decisions of our Supreme Court and this court that have addressed this topic have focused on two different components of colorability: (1) the factual merits and (2) the legal merits of the claims at issue.

For example, in *Maris* v. *McGrath*, supra, 269 Conn. 847–48, our Supreme Court focused on the lack of colorable facts in the case to affirm the judgment of this court, which had concluded that the trial court properly awarded attorney's fees because it found, inter alia, that the litigant's claims factually were "wholly without merit" and "totally false."[17] Id., 848. More specifically, it held: "As applied to a party, rather than to his attorney, a claim is colorable, for purposes of the bad-faith exception to the American rule, if a reasonable person, given

his or her first hand knowledge of the underlying matter, could have concluded that the facts supporting the claim might have been established. . . . This is an appropriate . . . standard . . . because it focuses on the party's firsthand knowledge of the facts and whether, given that knowledge, the party reasonably could have concluded that his or her claim might be established. This standard, moreover, takes into account the capacity of the party for truthfully or untruthfully recounting those facts, as well as the capacity for honest mistakes, recollections and disagreements over those facts." (Citation omitted; internal quotation marks omitted.) *Maris* v. *McGrath*, supra, 847.

On the other hand, other cases have focused on the legal sufficiency of the claims in determining whether the action was entirely without color. For instance, in *Hirschfeld* v. *Machinist*, 131 Conn. App. 364, 27 A.3d 395, cert. denied, 302 Conn. 947, 30 A.3d 1 (2011), this court concluded, inter alia, that the trial court made the necessary finding that the claim was not colorable because "the parties' [separation agreement incorporated into the judgment dissolving their marriage] contained a merger clause in which the parties agreed that there were no outstanding issues between them other than those set forth and resolved in that agreement." (Footnote omitted.) Id., 370. The trial court explained that "despite that agreement, the plaintiff subsequently brought an action in New York seeking to litigate a claim that was ten years old," as well as brought an unsuccessful small claims action in Connecticut in which "the plaintiff also had requested relief based on facts that arose well before the agreement of the parties." Id. For these reasons, the trial court concluded, and this court agreed, that the action legally was entirely without color. Id.

Similarly, in *Berzins* v. *Berzins*, supra, 306 Conn. 651, our Supreme Court concluded that the trial court adequately found that the party's claims were legally without color by relying "on numerous and duplicative motions filed by the [party]—each set forth by the court in the memorandum of decision—which the court expressly found to have been frivolous. In further support of its determination, the court took judicial notice of two additional actions brought by the [party] . . . seeking to relitigate the division of property ordered by the court in the [prior] dissolution decree, which the court found to have been wholly without basis." (Footnote omitted.) Id., 660.

In the present case, there is no indication in the court's December 8, 2015 oral decision that it considered whether the action was so lacking in factual or legal support that a reasonable person could not have concluded that the basis of the claim might have been established. Therefore, we do not know whether the

court found that the action was entirely without color based on the facts underlying the case, or whether the action was entirely without color because it was legally frivolous. We address both possibilities in turn.

With respect to the factual merit of the plaintiff's action, the court made no findings on the record that addressed whether it was in the best interests of the minor child for the plaintiff to have custody. We begin by noting that, because this is a child custody proceeding, the question of whether the plaintiff here "could" prevail factually on his application is a somewhat subjective inquiry, given that the court has considerable discretion in fashioning its custody orders. Specifically, General Statutes § 46b-56 (a) provides in relevant part: "In any controversy before the Superior Court as to the custody or care of minor children . . . the court may make . . . any proper order regarding the custody . . . of the children if it has jurisdiction under the provisions of chapter 815p. . . . [T]he court may assign parental responsibility for raising the child to the parents jointly, or may award custody to either parent or to a third party, *according to its best judgment* upon the facts of the case and subject to such conditions and limitations as it deems equitable. " (Emphasis added.) "In making . . . any order . . . the rights and responsibilities of both parents shall be considered and the court shall enter orders accordingly that serve the best interests of the child . . . ."[18] General Statutes § 46b-56 (b).

In other words, by virtue of the fact that the outcome in the present action was so dependent on the court's personal assessment of what was in the best interest of the child, versus its application of black letter law, it is inherently more difficult for a court considering a custody application to determine that no reasonable person could have concluded that the facts supporting the application might have been established. Indeed, in the present case, the court never indicated on the record that its finding of "entirely without color" was grounded in a determination that no reasonable person could have concluded that awarding the plaintiff some degree of custody might be in the best interest of the child. In fact, although the defendant makes the argument in her brief that "a custody action is . . . a comprehensive determination of what is in a child's best interest," and that "the prospects of the plaintiff ever being awarded custody were extraordinarily dim" in light of several factors implicating the best interest of the child,[19] *the court never mentioned the best interest of the child standard at any point during its ruling.*

Because the court did not base its "entirely without color" finding on any factual considerations of what might be in the best interest of the minor child here, we turn to the question of whether the court based its finding on any legal considerations. On this point, the

plaintiff suggests that, in child custody matters, it is necessary for the court, in determining whether the claims are colorable, to consider whether the party reasonably could have concluded that both standing[20] and jurisdiction might have been established. The plaintiff then argues that because he, "as a person holding himself out as [the minor child's] father, had the absolute right to claim a determination of custody and visitation of his son, who is an American citizen, in [the minor child's] home state of Connecticut," his custody claim was necessarily colorable. After reviewing the transcript of the court's oral decision in this matter, we conclude that it is not necessary to address this argument because the court here expressly stated that it was not basing its "entirely without color" finding on jurisdictional considerations.[21] At the same time, however, we think it prudent to note that, to the extent the court did discuss jurisdiction in its ruling, it acknowledged several times that Connecticut had legitimate "home state jurisdiction" under the Uniform Child Custody Jurisdiction and Enforcement Act, General Statutes § 46b-115 et seq., at the time the custody application was filed, thereby suggesting the alternate conclusion that the plaintiff's custody action *was* colorable with respect to its legal sufficiency.

Finally, we recognize the defendant's argument in her brief that "the plaintiff's petition was wholly without merit at its inception" because it was brought for ulterior purposes, namely, in retaliation for the defendant filing the Stockport proceeding and with the purpose to harass her. Because this assertion relates to whether the plaintiff was motivated by improper purposes in bringing or conducting this litigation, however, it bears upon the finding of bad faith conduct. See *Maris* v. *McGrath*, supra, 269 Conn. 845 (clear evidence that challenged actions are taken "for reasons of harassment or delay or for other improper purposes" supports finding of bad faith conduct). In our view, the assertion is not particularly relevant to the court's finding that the claims were entirely without color.[22] Indeed, we can theorize several circumstances in which a litigant may have retaliatory or other questionable motives in choosing to initiate an action against another, yet his or her claims may still have legal or factual merit and, thus, are not entirely without color.

As previously discussed, *Maris* makes clear that in order to impose attorney's fees and costs as a sanction pursuant to its inherent authority, the court must find *both* that the litigant's claims were entirely without color *and* that the litigant acted in bad faith. *Berzins* v. *Berzins*, supra, 306 Conn. 663. Because we conclude that the court has failed to make the former finding with the specificity required by *Maris*, we need not consider whether the court adequately found that the plaintiff also acted in bad faith. Accordingly, we reverse the judgment of the trial court and remand the matter

for further proceedings in accordance with this opinion.

The judgment is reversed and the case is remanded for further proceedings.

In this opinion the other judges concurred.

[1] "The so-called 'American rule' for the award of attorney's fees to the prevailing party bars such an award except as provided by statute or in certain defined exceptional circumstances . . . ." (Internal quotation marks omitted.) *Maris* v. *McGrath*, 269 Conn. 834, 835, 850 A.2d 133 (2004).

[2] Because we determine that the court did not make the necessary findings to satisfy the bad faith exception pursuant to *Maris*, we do not consider the remainder of the plaintiff's claims.

[3] The motion was accompanied by an affidavit of attorney's fees.

[4] As we discuss at greater length in this opinion, before awarding the defendant her attorney's fees, the court was obligated to find that the action was brought in bad faith *and* entirely without color.

[5] On September 21, 2015, the plaintiff filed an amendment to paragraph two of his proposed findings of fact.

[6] We acknowledge that the plaintiff appears to devote little attention in his brief to challenging the procedural aspect of the court's hearing, stating: "[T]he trial court did not hold a full evidentiary hearing, but instead relied on the transcripts and evidence submitted in the motion to dismiss hearings, which presented different issues and evidence than what is required for awarding attorney fees." Although the plaintiff stated at oral argument that he took issue with the way the court conducted the proceeding, he conceded that he has not adequately raised this claim on appeal. In light of this concession and the fact that the plaintiff does not provide any law or analysis in his brief to support this proposition; see *Jalbert* v. *Mulligan*, 153 Conn. App. 124, 133, 101 A.3d 279, cert. denied, 315 Conn. 901, 104 A.3d 107 (2014); we decline to address the merits of this argument. Nevertheless, we acknowledge that this assertion by the plaintiff echoes our related concern regarding the procedures utilized by the court.

[7] For example, the following colloquy took place between the court and the plaintiff's counsel during the hearing:

"The Court:  . . .  Plaintiff was born on August 27, 1957. Agree?

"[The Plaintiff's Counsel]: If that's in—if that's what it says in our—

"The Court: I'm not gonna go yours—you're gonna have to know. You either agree or you don't.

"[The Plaintiff's Counsel]: I have to look it up, Your Honor. I just can't say yes or no. I'm looking at my September 10, 2015. Let's see what it says here. I don't think I have the plaintiff's date of birth. So I—I have to just leave that to the defendant's proof.

"The Court: Fine. I'm finding that a fact. I'm—how about the defendant was born on December 18, 1972?

"[The Plaintiff's Counsel]: It's also not addressed in the plaintiff's proposed [findings of fact].

"The Court: Okay. I'm going to also find that a fact as well. Number three, the parties met in October of 2009 and began cohabitating in the U.S. in Greenwich, Connecticut, in February of 2010.

"[The Plaintiff's Counsel]: I have to leave that to the defendant's proof.

"The Court: I'm finding it as fact. . . ."

[8] The court adopted these paragraphs in their entireties with limited exception. For example, in paragraph eight, the court explained that it did not think that portion, which asserted that the plaintiff's "application [for a Hague Convention proceeding in the U.K.] was publically funded by the [U.K.]," was "particularly relevant to [the] circumstances here."

[9] It is not clear from the record if the court adopted the portion of the defendant's proposed finding of fact that provides that the plaintiff brought the Hague proceeding as retaliation for the defendant bringing the Stockport proceeding. On this issue, the following colloquy took place between the court, the plaintiff's counsel, and the defendant's counsel:

"The Court: Okay. Is there any question about paragraph eight that in response to the petition brought in Stockport that [the plaintiff] on October 18, 2011, brought a Hague Convention proceeding against the defendant?

"[The Plaintiff's Counsel]: Your Honor, about that time [the plaintiff] did bring a Hague Convention proceeding. The rest of the characterizations in that paragraph are denied.

"The Court: Well, hang on for one sec, let's go through it. Okay. I—I'm not asking you about in retaliation for it. I'm not asking about. Is there are any question that he brought a Hague Convention proceeding—

"[The Plaintiff's Counsel]: He did bring a Hague Convention.

"The Court: —in response to the custody petition?

"[The Plaintiff's Counsel]: Well, response, I'm—I'm—as the Court is doing here, I'm being very meticulous.

"The Court: Okay.

"[The Plaintiff's Counsel]: I don't know if he intended it as an answer. He brought it after the fact. Yes.

"The Court: Okay. After the custody petition was brought about in Stockport, [the plaintiff] brought a Hague Convention matter.

"[The Plaintiff's Counsel]: I believe that's accurate.

"The Court: Okay.

"[The Defendant's Counsel]: You'll also—

"The Court: The court is finding that as a fact. Yes, counsel?

"[The Defendant's Counsel]: Also, Your Honor, attached is exhibit C to my proposed findings of fact, trial exhibit C, and it's an e-mail from [the plaintiff] dated September 30, 2011, to [the defendant]; and it says, I'm going to write you an e-mail this weekend on all of your issues. I do not want a legal battle or a fight. The problem is you started legal proceedings and both my U.K. lawyers as well as U.S. lawyers are urging me to respond in kind. And then he says, I do not want to go down that path. Please respond to my e-mail. Read my e-mail this weekend.

"The Court: Okay.

"[The Defendant's Counsel]: And—and so that was to me, additional evidence that he brought—

"The Court: Thank you.

"[The Defendant's Counsel]: —the Hague petition in retaliation for Stockport.

"The Court: The court finds that as a fact. . . ."

[10] We note that although the plaintiff's affirmation of these statements is arguably misleading, it factually may be accurate because, pursuant to the Uniform Child Custody Jurisdiction and Enforcement Act (act) as adopted by Connecticut in General Statutes § 46b-115 et seq., a "state" is defined as "a state of the United States, the District of Columbia, Puerto Rico, the United States Virgin Islands, or any territory or possession subject to the jurisdiction of the United States." General Statutes § 46b-115a (15). At the time the plaintiff signed the affidavit in question, the only other custody proceedings taking place were in the U.K., which is not a "state" within the definition provided by the act.

[11] Also in August, 2012, the plaintiff contacted children's services in the U.K. and alleged that the defendant had abducted, abused, and exploited the minor child, although those allegations were investigated and found to be unsubstantiated. During that same time, the plaintiff and some of his family members waged a "campaign of defamation and harassment against the defendant" over the Internet and social media that resulted in U.K. orders against the plaintiff requiring him to cease and desist those actions.

[12] On January 30, 2014, the defendant filed an application seeking reciprocal enforcement of the U.K. child support orders in Connecticut. That application was granted by the Superior Court, and the plaintiff was served with the order on May 6, 2014. The plaintiff appeared through counsel in that matter, which was brought before a family support magistrate, and filed several motions, including a motion for a paternity test. After the plaintiff did not appear at a hearing on September 17, 2014, in that matter, the family support magistrate issued a capias for his arrest with a purge amount of $50,000. The plaintiff's counsel represented to the court in the present case that the plaintiff had not appeared in person at the October 31, 2014 and December 1, 2014 hearings in this custody action because he did not want to be arrested due to the outstanding capias.

[13] At that hearing, the court informed the plaintiff: "I just wanted to make it clear to you that . . . counsel have talked about motions for attorney's fees [in the future], which I will maintain."

[14] Although this exception to the American rule is often referred to in shorthand as "the bad faith exception," the label is somewhat of a misnomer as it encompasses *both* of the required findings previously discussed herein, that is, that the litigant's claims were entirely without color and that the litigant acted in bad faith. See *Maris* v. *McGrath*, supra, 269 Conn. 845.

[15] We note that only five of the twenty-eight proposed factual findings adopted by the court concerned events that took place within the present case. Rather, the majority of the findings recounted events that occurred within the context of other litigation between the parties, including the Stockport proceeding, the Hague proceeding, and the maintenance order enforcement action before the family support magistrate in Connecticut. Although these remaining twenty-three paragraphs may certainly be relevant

to the question of whether the plaintiff engaged in bad faith conduct, they have minimal relation to whether or not this custody action was brought entirely without color. In determining whether the action was brought entirely without color, the Second Circuit has suggested that the focus should solely be on what has occurred in the present litigation. See *Dow Chemical Pacific Ltd.* v. *Rascator Maritime S.A.*, 782 F.2d 329, 345 (2d Cir. 1986) ("[w]e think it appropriate to note . . . that the litigation to be focused on is the same litigation in which the fee award is under consideration").

[16] We note that although we reverse the judgment of the trial court, nothing in this opinion should be construed as approving, in any way, the plaintiff's conduct in this and the related proceedings concerning the minor child.

[17] More specifically, this court held: "In light of the [trial] court's findings of fact, it is apparent that a reasonable person could not have come to the conclusion that the plaintiff could prevail. The plaintiff knew that the defendant had never promised to execute a document providing that moneys he put in the joint account would be paid back from the proceeds of the sale of her house, that he had written the word loan in the memorandum section of the check after the defendant had signed it, and that the allegations on which he grounded his action were false. There is ample evidence in the record to support the court's findings and ultimate conclusions." (Footnote omitted.) *Maris* v. *McGrath*, 58 Conn. App. 183, 190–91, 753 A.2d 390 (2000), aff'd, 269 Conn. 834, 850 A.2d 133 (2004).

[18] In considering the best interest of the child, the court "may consider, but shall not be limited to, one or more of the following factors: (1) The temperament and developmental needs of the child; (2) the capacity and the disposition of the parents to understand and meet the needs of the child; (3) any relevant and material information obtained from the child, including the informed preferences of the child; (4) the wishes of the child's parents as to custody; (5) the past and current interaction and relationship of the child with each parent, the child's siblings and any other person who may significantly affect the best interests of the child; (6) the willingness and ability of each parent to facilitate and encourage such continuing parent-child relationship between the child and the other parent as is appropriate, including compliance with any court orders; (7) any manipulation by or coercive behavior of the parents in an effort to involve the child in the parents' dispute; (8) the ability of each parent to be actively involved in the life of the child; (9) the child's adjustment to his or her home, school and community environments; (10) the length of time that the child has lived in a stable and satisfactory environment and the desirability of maintaining continuity in such environment, provided the court may consider favorably a parent who voluntarily leaves the child's family home pendente lite in order to alleviate stress in the household; (11) the stability of the child's existing or proposed residences, or both; (12) the mental and physical health of all individuals involved, except that a disability of a proposed custodial parent or other party, in and of itself, shall not be determinative of custody unless the proposed custodial arrangement is not in the best interests of the child; (13) the child's cultural background; (14) the effect on the child of the actions of an abuser, if any domestic violence has occurred between the parents or between a parent and another individual or the child; (15) whether the child or a sibling of the child has been abused or neglected . . . and (16) whether the party satisfactorily completed participation in a parenting education program . . . ." General Statutes § 46b-56 (c).

[19] Specifically, the defendant contends that the plaintiff's chances of obtaining custody were extremely low because "the child was just one year old and 'on the mother' as Judge Brasse in England had put it," "the defendant was the child's indisputable primary caregiver," "[the plaintiff] was . . . assessed as prone to anger and violence," and "the plaintiff was hardly eligible to be a primary or even secondary caregiver, as the plaintiff himself said that he was never home, routinely working seventy-five to eighty-five hours per week at the time the petition was brought, starting at 5:30 [a.m.] and working until 10 p.m. daily, six days a week." None of these assertions were ever found as facts, nor discussed by the court in any capacity in its oral decision on the motion for attorney's fees.

[20] Although the plaintiff did file a motion for a paternity test in the child support action before the family support magistrate, lack of standing never appeared to be at issue in the present case, presumably because the plaintiff is the natural father of the minor child. See *Pi* v. *Delta*, 175 Conn. 527, 532–33, 400 A.2d 709 (1978).

[21] Specifically, the court stated to the plaintiff's counsel that "[t]he standard is that the litigant's claims were—were entirely without color, not whether

or not you can get in the door by way of jurisdiction.''

[22] In addition, the defendant's argument that the plaintiff's claims were entirely without color because they were brought for retaliatory purposes also founders because the court never made such a finding in the context of the present litigation, although it arguably did find that the plaintiff's action in bringing the Hague proceeding against the defendant in October, 2011, was motivated by retaliation. See footnote 8 of this opinion. Importantly, however, that was a proceeding entirely separate from the present custody proceeding and, thus, entirely separate from the colorability of the claims at issue here. See footnote 14 of this opinion.

---